OAKLAND COUNTY v STATE OF MICHIGAN

Docket No. 81367. Argued November 3, 1988 (Calendar No. 12).
    Decided March 9, 1989.

Oakland County and the Oakland County Executive brought an
    action in the Court of Claims against the State of Michigan and
    others, alleging that the grant-in-aid program established under
    1978 PA 416 to provide monies to defray a county's cost in
    providing road patrol services to townships, had been breached
    by the Office of Criminal Justice, the agency designated to
    administer the program, when it withheld grant funds. The
    Office of Criminal Justice had withheld the funds on the
    ground that the county had ceased to comply with the mainte-
    nance-of-effort provision, § 77(1) of the act, by reducing the
    number of road patrol deputies. The provision conditions the
    receipt of grant funds, in the absence of economic hardship, on
    the retention of the level of road patrol services and expendi-
    tures for law-enforcement services that were in existence at the
    time of the program's inception. The court, James T. Kallman,
    J., granted summary disposition for the plaintiffs, and held that
    the county was entitled to funding because its overall number
    of personnel exceeded its 1978 base level. The Court of Appeals,
    HOOD, P.J., and MACKENZIE and R. M. PAJTAS, JJ., reversed,
    finding the maintenance-of-effort clause unambiguous because
    it spoke solely in terms of the county and its efforts without
    mention of contractual agreements either with townships or
    other outside agencies (Docket No. 90911). The plaintiffs appeal.

        In an opinion by Justice BRICKLEY, joined by Chief Justice
    RILEY and Justices LEVIN, CAVANAGH, BOYLE, and GRIFFIN, the
    Supreme Court held:

        A literal reading of the requisite maintenance-of-effort provi-
    sion of § 77(1) supports the finding that in this case the funds
    secured by contract from the township, and the deputies
    financed by the funds, should be included in the determination
    of eligibility for grant monies under 1978 PA 416. Such a

REFERENCES

Am Jur 2d, Highways, Streets and Bridges §§ 123-129; Municipal
    Corporations, Counties, and Other Political Subdivisions § 123.
See the Index to Annotations under Highways and Streets.

reading is also consistent with the overall scheme and purpose of the act.

1. The question to be decided is not whether the county could reduce its level of road patrol, because it cannot. The issue is whether the county failed to meet the maintenance-of-effort requirement only because the money it expended came to the county from township funds, rather than from the county's general fund, even though the county maintained its expenditures and the level of road patrol at the required minimum.

2. The maintenance-of-effort provision requires that county expenditures and the level of road patrol not be reduced. It is undisputed that the deputy sheriff positions at issue in this case are filled by county employees and are part of the sheriff's road patrol. It is further undisputed that the number of deputies, and therefore that the level of road patrol, was not reduced between the year of the passage of the act, 1978, and the year in dispute, 1983. It is difficult to avoid the conclusion that a plain and literal reading of the phrase "its expenditures" includes any monies the county secures in any manner which it expends. The act makes no reference to revenue or sources of revenue, only to "its expenditures." Furthermore, it is not disputed that the 1983 sheriff's road patrol is supported by a county expenditure.

3. Nothing in the legislative history of 1978 PA 416 or in its overall scheme or objective argues against a literal interpretation of the maintenance-of-effort provision of § 77(1). The act clearly was intended to augment levels of county expenditures in existence at the time of its passage. Contractual agreements between counties and townships to help counties defray the costs of road patrols were recognized facts at that time. It was also clearly intended that state funds were not to replace the level of road patrol funding then in existence. The fact that the Legislature did not impose a maintenance-of-effort provision on townships similar to that which it imposed on cities and villages, indicates that it viewed the county and the township as one for purposes of carrying out the intention of the act. No aspect of 1978 PA 416 is frustrated by allowing a county to make its expenditures for the road patrol from funds derived from townships.

4. 1978 PA 416 provides no legislative intention, expressed or implied, that preexisting general fund expenditures must be maintained, that townships must be discouraged from paying an increased share in the cost of maintaining the preexisting level of the road patrol, or that a county must be discouraged from seeking other than general fund support for the road

patrol as part of its maintenance of effort. The only intention expressed is that a county must not supplant "its expenditures" with grant funds. There is no suggestion that a county cannot ask a township to increase its spending to help the county maintain a level of road services necessary to avoid a loss of grant monies. In this case, in the final analysis, the county is not using grant monies to supplant a preëxisting level of road patrol. Rather, it is using township contributions to supplant its preëxisting general fund contribution to the road patrol.

Reversed and remanded.

Justice ARCHER, dissenting, stated that compliance with 1978 PA 416, § 77(3) should be determined by the number of secondary road patrol officers funded solely by the county-grant recipient.

1978 PA 416 was intended to encourage road patrol service on local and county roads through coöperative efforts of local and county governments by means of grant-in-aid funding. In order to ensure that each level of local government involved should bear the primary financial responsibility for law-enforcement services and not indirectly shift the responsibility to the state, two complimentary maintenance-of-effort provisions were included in the act. Section 77(3) conditions a county's receipt of state grant-in-aid funding for secondary road patrol services by requiring, in the absence of economic hardships, that a grant recipient retain the level of road patrol services and expenditure for law enforcement services in existence at the time of the program's inception. Section 76(3) acknowledges the right of local municipalities to enter into contractual arrangements with their respective county sheriff's departments for additional road patrol services, conditioning the validity of these agreements upon a maintenance-of-effort provision, comparable to § 77(3), which renders any such contractual arrangement void should the participating local municipality reduce its level of law enforcement below the highest number of officers in existence within thirty-six months of entering into the contractual arrangement with the county for services. Section 77(3)'s silence on the inclusion of outside sources of funding is consistent with the Legislature's intention to examine local and county government independently for purposes of grant funding. However, § 76(3) speaks only in terms of base level of personnel which cities and villages must maintain and is silent with regard to whether township participation under the act is to be so similarly held. To equate autonomous township with county government in the absence of clear statutory language, ignores the reality that counties and townships are separate

entities. While townships apparently are not subject to § 76(3), because § 77(3) speaks only to counties, the contracts in this case should not be included within consideration of the county's base level of road patrol.

1978 PA 416 provides an opportunity, not a guarantee, for local and county governments to receive additional funds as a means of expanding services whose distribution rests with local and not state government. As in any other grant-in-aid program, the opportunity to receive remedial benefits is premised upon the grant recipient's satisfaction of the conditions precedent to funding eligibility. In this case, the county's failure in 1983 to maintain its general fund personnel at the 1978 base levels as required by § 77(3) denies the county the opportunity to receive assistance under the act.

1978 PA 416 does not provide for substantial compliance with § 77(3)'s maintenance-of-effort provision. The provision is a substantive prerequisite to the receipt of grant funds. Section 77(3), however, provides for funding where noncompliance with the maintenance-of-effort provision is due to economic hardship necessitating budgetary reductions in all county services. In this case, the county did not contest the findings of the Office of Criminal Justice that its budget did not exhibit sufficient economic constraints.

Grant-in-aid programs are statutory creations and are distinguishable from traditional bilateral contracts. Terms qualifying the receipt of aid are not subject to negotiation, are subject to unilateral modification by the state or federal government, and may not be waived by the agency entrusted with implementation. Further, all rights of redress are determined unilaterally. Any ambiguity within a provision of an agreement entered into as part of the program, or any inconsistency between the controlling statute and a county's administrative guidelines, must be resolved pursuant to the construction of the controlling statute upon which the agreement itself is premised. In this case, to the extent that the county's administrative guidelines are inconsistent with the Supreme Court's construction of § 77(3), they should be held to be invalid.

161 Mich App 335; 410 NW2d 812 (1987) reversed.

1. COUNTIES — ROAD PATROL SERVICE — GRANTS-IN-AID — MAINTENANCE OF EFFORT.

The maintenance-of-effort provision of the grant-in-aid program to defray the expense of contractual agreements between county and township governments for the provision of additional secondary road patrol service did not preclude a county from using contributions by a township to supplant its general fund expen-

ditures to maintain its road patrol services at the level necessary to qualify for grant monies (1978 PA 417, MCL 51.77[1]; MSA 5.868[17][1]).

2. COUNTIES — ROAD PATROL SERVICE — GRANTS-IN-AID — MAINTENANCE OF EFFORT.

The maintenance-of-effort provision of the grant-in-aid program to defray the expense of contractual agreements between county and township governments for the provision of additional secondary road patrol service contains no legislative intention, expressed or implied, that preëxisting general fund expenditures must be maintained, that townships must be discouraged from paying an increased share in the cost of maintaining the preëxisting level of the road patrol, or that a county must be discouraged from seeking other than general fund support for the road patrol as part of its maintenance of effort; the only intention expressed is that a county must not supplant "its expenditures" with grant funds (1978 PA 417, MCL 51.77[1]; MSA 5.868[17][1]).

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *William P. Hampton* and *Lanie Anderson*) for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gary P. Gordon* and *Merry A. Rosenberg,* Assistant Attorneys General, for the defendants.

BRICKLEY, J. This case comes to us for an interpretation of the maintenance-of-effort provision under § 77(1) of 1978 PA 416, which provides road patrol grants to Michigan's county sheriffs.

The Court of Appeals set forth the historical development of the passage of this act and resulting conflict between the parties.

Defendants appeal as of right from the opinion and order entered February 13, 1986, by the Court of Claims in which the court granted plaintiffs' motion for summary disposition pursuant to MCR 2.116(C)(10) and ordered defendants to pay

$422,000 to plaintiffs under 1978 PA 416, specifically MCL 51.77; MSA 5.868(17).

MCL 51.77; MSA 5.868(17) provides for county sheriff departments to receive a grant from Michigan's Office of Criminal Justice to help defray the cost of road patrol if the county meets certain qualifications. A history of the act in question will aid in understanding the issue on appeal. Neither the common law nor Michigan statutory authority impose[s] a duty on the sheriff of a county to supply full-time road patrol on all county roads and highways. *Brownstown Twp v Wayne Co*, 68 Mich App 244, 251; 242 NW2d 538 (1976), lv den 399 Mich 831 (1977). In *Brownstown Twp,* several townships sued the Wayne County Board of Commissioners to provide the necessary funds to enable the Wayne County Sheriff to continue road patrol service in outlying county areas. This Court stated that a stricter duty to maintain law and order was imposed upon the sheriff in areas of the county not adequately policed by local authorities, but added that the sheriff was not required to regularly patrol those areas. *Id.* . . .

Act 416 arose from the consensus that many of the roads in Michigan were inadequately patrolled and that enforcement of traffic regulations and availability of police officers to the public would be significantly enhanced by placing greater emphasis on road patrols. The Legislature established a list of services to be provided by a county sheriff's department which would receive grant monies under Act 416. . . . The county sheriff's department would be required to provide the expanded services only to the extent that state funds were provided. MCL 51.77(3); MSA 5.868(17)(3). . . .

\* \* \*

In short, Act 416 was designed to enhance county road patrol services by providing funds to support those efforts. It was designed to supplement, and not replace, existing county road patrol efforts. Act 416 was guided by the philosophy that if the state was going to mandate greater performance by a county sheriff's department, the state,

in fairness, ought to provide a supplement to local funding. . . .

The controversy in this case concerns the conditions which the Legislature attached to receipt of grant funds. These conditions are contained in MCL 51.77(1); MSA 5.868(17)(1) in a "maintenance of effort" (MOE) clause. The MOE clause is emphasized in the following passage:

"Before a county may obtain its grant from the amount annually appropriated for secondary road patrol and traffic accident prevention to implement section 76, the county shall enter into an agreement for the secondary road patrol and traffic accident prevention services with the office of criminal justice. . . . *An agreement entered into under this section shall be void if the county reduces its expenditures or level of road patrol below that which the county was expending or providing immediately before October 1, 1978, unless the county is required to reduce general services because of economic conditions and is not merely reducing law enforcement services.* [MCL 51.77(1); MSA 5.868(17)(1).]" [Emphasis in original.]

\* \* \*

The purpose of the MOE clause was to assure that a recipient county maintained the level of funding and the level of road patrol services that existed immediately prior to October 1, 1978, the effective date of Act 416. General guidelines issued on January 5, 1979, to the chairpersons of county boards of commissioners included the following statement:

"[I]nasmuch as it is [the] legislative intent that PA 416 funds not supplant county budget funding, the county budget for road patrol and the number of road-patrol officers authorized in the county budget prior to 1 October 1978 must be maintained."

From 1978 until 1983, plaintiffs successfully applied for and were awarded grant monies under Act 416. However, on April 29, 1983, plaintiffs were informed by the Office of Criminal Justice (OCJ), . . . [that it] no longer satisfied the eligibility

criteria established by MCL 51.77(1); MSA
5.868(17)(1). After negotiations failed, plaintiffs
filed the instant suit.

The dispute centers on whether "contractual"
sheriffs who were funded only partially by plain-
tiffs' county fund could be taken into account in
determining the amount of road patrol the county
was providing in 1983. The parties agree that the
amount of money expended by the county in-
creased from 1978 to 1983. The dispute centers on
whether the level of road patrol provided by the
county in 1983 declined below the 1978 level. A
review of the data submitted by plaintiffs [estab-
lishes that the county reduced its general fund
support based on an increase in positions funded
through contractual arrangements with the town-
ship. The net result was an increase in the total
number of road patrol officers.[1] . . . OCJ took the
position that "contractual" officers, i.e., those sup-
ported by the receipt of noncounty general fund
monies, could not be included in meeting the
service level of 1978. OCJ supported that conclu-
sion by referring to the statutory language
"county was expending or providing," and noting
its focus is on a county effort, and not combined
local government effort. Further, OCJ asserted that
its position was consistent with standard legal
interpretations of similar phrases. OCJ pointed out
that the forms and explanatory materials used in
the administration of Act 416 had consistently
been based on its interpretation from the inception
of the program. Finally, OCJ pointed out that to

---

| [1] | 1978 | 1983 |
|---|---|---|
| Gross Expenditures for Secondary Road Patrol | $5,555,160 | $9,163,329 |
| Number of Fully Funded Secondary Road Patrol Deputies | 48 | 25 |
| Number of Contract Deputies Assigned to Local Units of Government | 32 | 64 |
| Total Number of Secondary Road Patrol Deputies | 80 | 89 |

include contractual positions would require counties which suffer a reduction in contractual positions below the 1978 level to have to replace the contractual positions at county expense in order to retain eligibility. In other words, those counties would experience direct added costs. In contrast, the exclusion of contractual positions merely results in a loss of potential savings to counties which increase the number of contractual positions. . . .

The Court of Claims, . . . [included in its calculation of eligibility those deputies partially funded by townships in its determination] that the county expended more money and provided more deputy-hours of service in 1983 than in 1978 for road patrol services. [161 Mich App 335, 336-342; 410 NW2d 812 (1987).]

The Court of Appeals went on to conclude that the Court of Claims came to an erroneous conclusion.

We disagree and conclude that a literal reading of the requisite maintenance-of-effort provision of § 77(1) supports the finding that the funds secured by contract from the township, and the deputies financed therefrom should be included in the determination of eligibility for Act 416 grant monies. Such a reading is also consistent with the overall scheme and purpose of the act.

I

For emphasis, we restate the maintenance-of-effort provision as we begin our analysis with an interpretation of this statutory provision.

An agreement entered into under this section shall be void if the county reduces *its expenditures* or *level of road patrol* below that which the county was expending or providing immediately before October 1, 1978, unless the county is required to reduce general services because of economic condi-

tions and is not merely reducing law enforcement services. [MCL 51.77(1); MSA 5.868(17)(1). Emphasis added.]

The Court of Appeals stated:

The statute clearly states that an agreement shall be void if *"the county* reduces its . . . level of road patrol below that which *the county* was . . . providing" before October 1, 1978. [*Id.* at 343. Emphasis in original.]

The question to be decided is not, as the Court of Appeals states, whether the *county* could or could not reduce its level of road patrol. The answer to that is obvious, it cannot. The issue is whether the county failed to meet the maintenance-of-effort requirement only because the money it *expended* came to the county from township funds, rather than from the county's general fund, even though the county maintained "its expenditures" and "the level of road patrol" at the required minimum.

There are two requirements of the maintenance-of-effort provision: that (1) county "expenditures" and (2) the "level of road patrol" not be reduced. It is undisputed that the deputy sheriff positions at issue are filled by county employees and are part of the sheriff's road patrol. Therefore it is undisputed that the number of deputies, and therefore the "level of road patrol," was not reduced between the year of the passage of the act, 1978, and the year in dispute, 1983.

It is, in our view, difficult to avoid the conclusion that a plain and literal reading of "its expenditures" would include any monies the county secures in any manner which it expends.[2] The Legis-

---

[2] The parties labor over a strict versus liberal interpretation of the maintenance-of-effort provisions. We find such a distinction unneces-

lature made no reference to revenue or source of revenue, only to "its expenditures." Furthermore, no one questions that the 1983 sheriff's road patrol (the year in dispute) is supported by a county expenditure.

Without explanation or analysis, the Court of Appeals has ignored the key words "its expenditures or level of road patrol" in the maintenance-of-effort provision. It has made the controlling factor of its analysis the source of county financial support represented by township funds paid to the county on a contractual basis.

Defendants-appellees see them as township funds, as opposed to county monies, and, for purposes of the maintenance-of-effort language of the act, would have us read into the concept of required county support only activities supported by the county general fund.[3] They also focus on the source of funds rather than on the key words of the maintenance-of-effort provision. The appellants, on the other hand, point to a communication from the agency that administers the Act 416 grant funds, Office of Criminal Justice (OCJ), which adopts the general fund standard for evaluating

---

sary when the language is clear and so susceptible to a literal reading that results in a conclusion not inconsistent with the purposes of the statute.

[3] The appellees' only citation to case law in support of their interpretation of the maintenance-of-effort provision is to *Bennett v Kentucky Dep't of Ed,* 470 US 656; 105 S Ct 1544; 84 L Ed 2d 572 (1985), in which the Supreme Court decided a maintenance-of-effort question under title I of the Elementary and Secondary Education Act. The appellees analogize to the relationship between the federal government and the State of Kentucky in *Bennett* with the relationship between the state and the county herein. However the analogy breaks down because the Supreme Court made no mention of Kentucky's mix of state and local spending in its finding that the State of Kentucky had used title I funds to supplant its own educational program. In fact, it lumped them together and referred to "state and local" expenditures. Unlike our situation, where the county-township total expenditures exceed the required level of road patrol, in *Bennett* the combined state and local expenditures were reduced.

county effort, but nonetheless comments on the various sources of *county funding* and includes, in addition to general fund tax revenues, "specific grant funds (i.e., . . . contractual arrangements with other governmental units)." Apparently without realizing it, the Court of Appeals gave the correct answer to the right question when it said, "[t]he parties agree that the amount of money *expended* by the county increased from 1978 to 1983." *Oakland Co v Michigan, supra* at 341 (emphasis added). However, the Court of Appeals, led by a deference to an OCJ interpretation of the statute,[4] placed a gloss on the maintenance-of-

---

[4] The Court of Appeals added:

> The construction given to a statute by those charged with executing it, although not binding on the courts, is entitled to the most respectful consideration and ought not be overruled without cogent reasons. [*Id.* at 345, citing *Production Credit Ass'n of Lansing v Dep't of Treasury,* 128 Mich App 196, 197-198; 339 NW2d 871 (1983).]

The Office of Criminal Justice is an agency which operates under the direction of the Department of Management and Budget for the purpose of performing specific administrative duties. MCL 18.403; MSA 3.519(3). However, the statute does not authorize the OCJ to act in a judicial or quasi-judicial capacity, nor does it limit the jurisdiction of appellate courts as to the scope of judicial review. There is nothing in the statute to suggest that the Legislature intended the OCJ to act as an exclusive administrative factfinder and that because of its expertise the court should afford due deference to its findings.

The leading case setting forth the scope of judicial review of administrative decisions is *MERC v Detroit Symphony Orchestra,* 393 Mich 116, 121; 223 NW2d 283 (1974), in which we stated:

> Const 1963, art 6, § 28 . . . sets forth the minimum constitutional scope of judicial review of administrative decisions.
> "All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record."

effort provision of the act which shifted the focus from county "expenditures" to county source of funds. Such a distortion of the very precise words of the maintenance-of-effort provision could only be justified, if at all, if an overall reading of the intent and purpose of Act 416 dictated such a result.

II

There is nothing in the legislative history of Act 416, or in its overall scheme or objective, that would argue against a literal interpretation of the maintenance-of-effort provision of § 77(1).

A

Appellees have convinced themselves and, without any reference to the statute or its legislative history, attempt to convince us that it is their mission to prevent counties from seeking to maintain their required road patrol level by contributions from townships that rely on their services. The appellees argue:

Counting township funded deputies as county

In a footnote, we stated that similar language is used in the Administrative Procedures Act which sets forth the scope of appellate review:

(1) Except when a statute or constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

* * *

(b) In excess of the statutory authority or jurisdiction of the agency.

* * *

(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion. [MCL 24.306; MSA 3.560(206).]

funded means Plaintiffs are using township monies
to supplant the county monies which would other-
wise have gone to fund the road patrol. This is
precisely the evil which ocj intended to avoid by
refusing to allow counties to take credit for town-
ship funded offices.

What the Office of Criminal Justice sees as an
evil was not the concern of Act 416. In fact, the
act was clearly intended to augment the then-
existing levels of county expenditures (which at
that time included township funds), which is what
the maintenance-of-effort provision is all about.
Contractual agreements between county and town-
ship governments, in order to help *counties* defray
the costs of road patrol activities within specific
townships, were recognized facts at the time of the
passage of the act. A requirement in the act that
such agreements be reported annually, § 77(6)(d), is
evidence that the Legislature recognized the exis-
tence and purpose of these contracts.

It is interesting to note that the act also pro-
vides for a maintenance-of-effort arrangement,
§ 76(3), when the county contracts with a munici-
pality for § 76 duties. By agreement, the local unit
would be required by the § 76(3) maintenance-of-
effort provision to maintain its preëxisting level of
services, thus insuring that any Act 416 funds
being spent by the county within those local units
would not be replacing the effort of those local
units involved. However, in spite of the facts that
Act 416 grew out of the conflict between the
county and township governments, *Brownstown
Twp, supra,* and that county-township contracts
were not uncommon, the Legislature did not ad-
dress the relationship between the townships and
the counties. A third maintenance-of-effort ar-
rangement for the townships, similar to that be-
tween the municipalities and the county, and the

county and the state, is conspicuously absent from
the act.

B

The Legislature clearly intended, and so stated,
that Act 416 state funds not replace the level of
road patrol funding existing at the time of the
passage of the act. There would have been no
purpose in requiring that "its expenditures" had
to be from the county's general fund. Under the
Court of Appeals rationale, the county would effec-
tively be precluded, for example, from adopting
special millage and earmarking it for road patrol
purposes in order to free up general fund monies
for less popular endeavors. Similarly, a bequest
from a generous law-enforcement-minded taxpayer
earmarked for the road patrol could not be cred-
ited toward the county's maintenance of effort.

The fact that the Legislature did not impose a
maintenance-of-effort provision on townships simi-
lar to that which it imposed on cities and villages,
indicates that it viewed the county and the town-
ship as one for purposes of carrying out the inten-
tion of the act. This is further buttressed by the
fact that cities and villages, unless otherwise
agreed to, are not included in the sheriff's law
enforcement responsibilities under the act. The
townships and their inhabitants then are the pri-
mary service area of the county road patrol. Out-
side cities and villages, there are no county roads
that are not in townships. This may also account
for the fact that the maintenance-of-effort provi-
sion for the county refers to "its expenditures"
and "level of road patrol," rather than as in the
maintenance-of-effort provision for cities and vil-
lages, where it is measured only in "the number of
sworn law enforcement officers employed by the

city or village." The Legislature certainly knew
that part of the fiscal support for the road patrol
was coming from the townships through contrac-
tual agreements. All of this, then, argues for the
conclusion that the maintenance-of-effort provision
of § 77(1) envisions the effort of the township and
the county as one. There simply is no aspect of Act
416 that is frustrated by allowing a county to
make its expenditures for the road patrol from
funds derived from townships.[5]

### III

The Court of Appeals also advanced the policy
argument of the OCJ that its interpretation of the
maintenance-of-effort provision would be in the
county's best interest. If only county general funds
are counted toward the maintenance-of-effort re-
quirement, in the event of a reduction of "contrac-
tual positions," the county would not be forced to
replace them with its own funds in order to stay at
the 1978 level. Not only does the plaintiff—Michi-
gan's second largest county—not find this position
to be in its best interest, but more importantly it

[5] Since the most obvious purpose of the act is to have more funds
spent on county road patrols, it would be helpful to know if either
outcome has more effect than the other on the total amount of money
that would be spent on the road patrol in a given county. The record
is not helpful in that regard. One could speculate that, following the
Court of Appeals result, Oakland County would increase its general
fund support, while at the same time continue to receive the same
support from the townships, resulting in a net increased expenditure
for the road patrol. On the other hand, the Court of Appeals result
might cause the county to give up state funding and attempt to
secure even greater portions of its road patrol costs from townships. It
is also possible that the Court of Appeals result would cause the
county to increase its own county general fund contribution suffi-
ciently to qualify for the state funds, and at the same time for
political capital, forgo its acceptance of township contributions. In the
latter two situations, the Court of Appeals holding may not result in
an increase in the level of the road patrol. In any event, because of
the lack of record support for these speculations, this factor has not
been considered in our analysis.

works against the overall goal of the statute to enhance road patrol services beyond the 1978 level. Under this OCJ position, the level of the county's road patrol could be reduced below the 1978 level at the will of the township, without jeopardizing an Act 416 grant, as long as the county did not reduce its 1978 general fund support. Under our interpretation of the statute, the county would presumably have to use its own funds to make up any reduction in the township portion of the 1978 level of road patrol services, thus fulfilling the purpose of the maintenance-of-effort provision.

## CONCLUSION

Rather than beginning with a literal reading of the statute, the Court of Appeals began with an unexamined assumption that it was the source of funding that controlled, rather than the net "expenditures" and "level of road patrol." Having asked the wrong question, the Court of Appeals, in our judgment, comes to an erroneous conclusion.

In the final analysis, the plaintiff county is not using Act 416 grant monies to supplant a preëxisting level of road patrol. Rather, it is using township contributions to supplant its preëxisting general fund contribution to the road patrol.

There is no legislative intention, expressed or implied, that preëxisting *general fund* expenditures must be maintained. There was no intention expressed or implied that townships must be discouraged from paying an increased share in the cost of maintaining the preëxisting level of the road patrol, or that a county must be discouraged from seeking other than general fund support for the road patrol as part of its maintenance of effort. The only expression in the act is that the county

must not supplant "its expenditures" with Act 416 funds. There is no suggestion that a county cannot ask a township to increase its spending to help the county maintain a level of road services necessary to avoid a loss of Act 416 monies.

We reverse the decision of the Court of Appeals and remand to the trial court for further proceedings not inconsistent with this opinion.[6]

RILEY, C.J., and LEVIN, CAVANAGH, BOYLE, and GRIFFIN, JJ., concurred with BRICKLEY, J.

ARCHER, J. (*dissenting*). The Legislature enacted 1978 PA 416 in part to define the roles of county and local law-enforcement agencies with regard to the road patrol of local and primary county roads.[1]

---

[6] Defendants-appellees argue alternatively that, even in light of our decision, plaintiffs-appellants are still not eligible for grant monies. This ineligibility is based on plaintiffs-appellants' failure to comply with proper documentation and other application requirements to support the county's qualification for grant monies. Since this issue was not dealt with by the Court of Appeals or the Court of Claims, we do not consider it here. If deemed appropriate, the Court of Claims may entertain further proceedings not inconsistent with this opinion.

[1] MCL 51.76(2); MSA 5.868(16)(2) provides in relevant part:

> Each sheriff's department shall provide the following services within the county in which it is established and shall be the law enforcement agency primarily responsible for providing the following services on county primary roads and county local roads within that county, except for those portions of the county primary roads and county local roads within the boundaries of a city or village; and on those portions of any other highway or road within the boundaries of a county park within that county:
>
> (a) Patrolling and monitoring traffic violations.
>
> (b) Enforcing the criminal laws of this state, violations of which are observed by or brought to the attention of the sheriff's department while providing the patrolling and monitoring required by this subsection.
>
> (c) Investigating accidents involving motor vehicles.
>
> (d) Providing emergency assistance to persons on or near a highway or road patrolled and monitored as required by this subsection.

The act established a grant-in-aid program administered by the Office of Criminal Justice (OCJ) by which a county may qualify for state funding to defray the expense of contractual agreements between county and local governments in providing additional road patrol service. As a prerequisite to the receipt of grant monies, MCL 51.77(3); MSA 5.868(17)(3) conditions a county's receipt of state grant-in-aid funding for secondary road patrol services by a maintenance-of-effort provision,[2] which requires in the absence of economic hardship, that a grant recipient retain the level of road patrol service and expenditures for law-enforcement services in existence at the time of the program's inception.[3] We granted leave to consider whether a county's level of road patrol service is inclusive of personnel partially funded by contractual agreements between the county and local municipalities. I would hold that compliance with MCL

[2] "Maintenance of effort" . . . describes a common grant condition whereby the applicant for federal funds commits itself to spend on the program for which funding is sought no less than it has during the base year—a past period defined by the grant statute. The "effort" is fiscal and the "maintenance" is current support at levels equal to or greater than in the past. . . . The more common maintenance-of-effort condition obliges the grantee to commit itself to maintenance during the same year of federal funding. When the grantee fails in its [maintenance-of-effort] obligation, it has violated its commitment and is subject to fund recapture by lawsuit or fund withholding from future grants. [Cappalli, Federal Grants, § 4.09, pp 32-33.]

[3] MCL 51.77(1); MSA 5.868(17)(1) provides in relevant part:

Before a county may obtain its grant from the amount annually appropriated for secondary road patrol and traffic accident prevention . . . the county shall enter into an agreement for the secondary road patrol and traffic accident prevention services with the office of criminal justice. . . . *An agreement entered into under this section shall be void if the county reduces its expenditures or level of road patrol below that which the county was expending or providing immediately before October 1, 1978, unless the county is required to reduce general services because of economic conditions and is not merely reducing law enforcement services.* [Emphasis added.]

51.77(3); MSA 5.868(17)(3) is determined by the
number of road patrol officers funded solely by the
grant recipient. Accordingly, I would affirm the
decision of the Court of Appeals.

INTRODUCTION

Appellant Oakland County received Act 416
funding through fiscal years 1978-1982. However,
in March of 1983, appellant informed the OCJ of its
intention to reduce the number of road patrol
deputies supported solely from its general fund to
offset an anticipated deficit in the county budget
for fiscal year 1983. Appellant asserted that it
nonetheless satisfied its maintenance-of-effort re-
quirement as the overall number of road patrol
deputies, inclusive of those partially funded by
contractual agreements with local townships, ex-
ceeded the levels in effect in 1978.[4]

The OCJ disagreed, finding that the relevant

---

4

| | | |
|------|-----------|----------------------------|
| 1978: | $5,555,160 | Gross expenditures for |
| 1983: | $9,163,329 | secondary road patrol |
| 1978: | 48 | Number of fully funded |
| 1983: | 25 | secondary road patrol |
| | | deputies |
| 1978: | 32 | Number of contract dep- |
| 1983: | 64 | uties assigned to local |
| | | units of government |
| 1978: | 80 | Total number of secon- |
| 1983: | 89 | dary road patrol depu- |
| | | ties |

For fiscal year 1983, Oakland County anticipated an overall 10.7
percent reduction in personnel. However, appellants noted that for
the fiscal year in question, the sheriff's department expenditures
accounted for approximately twenty-nine percent of the nonmandated
portion of its budget. Further, the labor costs of road patrol service
reportedly increased at more than thirteen percent above other
county activities. On this basis, the county asserted its economic
condition justified a reduction in road-service personnel funded en-
tirely by the general fund by approximately forty-four percent.

Although the county's overall levels for road patrol expenditures
numerically exceeded its 1978 spending levels, once adjusted for
inflation, the county's proposed 1983 expenditures fell 1.49 percent
below its 1978 budget.

measure of the appellant's maintenance of effort rested upon the expenditures from its general fund exclusive of any contractual agreements with local townships. The OCJ further determined that the county's economic status did not justify an approximately forty-four percent reduction in road patrol personnel, pursuant to the economic-hardship exception of § 77(3)'s maintenance-of-effort clause. However, because the county intended a 10.7 percent across-the-board reduction in all its services, the OCJ concluded that it would remain eligible for Act 416 funding by this percentage reduction in its road patrol personnel.

Appellants filed suit in the Court of Claims, alleging that the OCJ's application of the maintenance-of-effort provision to Oakland County breached its grant-in-aid agreement.[5] In a memorandum opinion dated February 13, 1986, Judge James T. Kallman found that the language of the maintenance-of-effort provision was ambiguous as to the source of road patrol funding to be considered in a determination of a grant recipient's compliance with the maintenance-of-effort provision. Thus, Judge Kallman held that the county was entitled to Act 416 funding because the overall number of personnel exceeded its 1978 base levels.[6]

Appellees appealed in the Court of Appeals. A unanimous panel reversed the decision of the Court of Claims, finding that the maintenance-of-effort clause was unambiguous because it spoke

[5] Appellants also alleged that the OCJ erred in its determination that the county's economic status did not justify its proposed reduction in road patrol personnel. Appellants further asserted that the OCJ's actions violated its equal protection guarantees because of the OCJ's willingness to apply the economic-hardship exception to Wayne County's reinstatement of its road patrol personnel below its 1978 base levels after its 1980-81 fiscal crisis. The Court of Claims did not address the merits of either argument.

[6] See data at n 4.

solely in terms of the county and its efforts without mention of contractual agreements either with local townships or other outside agencies. 161 Mich App 335, 343-344; 410 NW2d 812 (1987). The panel concluded that its construction of § 77(3) was consistent with well-settled rules of statutory construction holding grant-in-aid provisions subject to strict construction in furtherance of the policy of protecting public funds from expenditure beyond the scope of the enabling statute creating the grant-in-aid program. *Id.* at 344-345.

Appellants sought leave to appeal in this Court. We granted leave, limited to the issue of the construction of § 77(3)'s maintenance-of-effort provision. 430 Mich 892 (1988).

I

The term "grant" or "grant-in-aid" "encompasses any disbursement or transfer by the federal [or state] government which supports programs and projects that benefit the public and which are accompanied by an agreement by the recipient of the property or disbursement to comply with any terms or conditions on the use of the property or disbursement."[7] Historically, grant-in-aid programs have served as catalysts for social innovation and improved public services which would be either impracticable or impossible in the absence of federal funding. While state grant-in-aid programs typically lack the influence and complexity present in their federal counterparts, they are comparable with regard to several key aspects.

Initially, all grant-in-aid programs are created by an enabling statute which delegates disburse-

[7] Mason, Federal Grant Law, p 5, n 1. Because the concept of grant-in-aid programs originated on the federal level, we rely primarily on case law and commentary discussing such programs in the absence of meaningful discussion on the state level.

ment of grant funds to an administrative agency.[8] Second, these programs generate a body of administrative rules and regulations, promulgated by the agency empowered with their administration, which typically govern a recipient's entitlement to grant monies.[9] Third, the grantor agency and recipient enter into a contractual agreement which essentially recites the substance of the grant-in-aid's statutory elements and the conditions agreed to by the recipient for its entitlement to funding.[10] Although these aspects are common to most grant-in-aid programs, the issue now before us is primarily one of statutory interpretation. Accordingly, I would turn first to the enabling statute and its legislative history in order to discern the appropriate construction of ₍ § 77(3)'s maintenance-of-effort provision. *People v Chambers,* 430 Mich 217, 222; 421 NW2d 903 (1988).

A

The legislative history of § 77(3) is silent with regard to the question whether a county grant recipient may satisfy the maintenance-of-effort provision by the inclusion of road patrol personnel partially funded by contractual arrangements with local government.[11] Appellants assert that because

[8] See text of the enabling statute at n 1.

[9] With the exception of memoranda issued by the OCJ in response to questions by grant recipients concerning their eligibility for funding, the appellee has not issued formal guidelines governing entitlement to Act 416 funding, opting in the alternative to address eligibility questions case by case.

[10] In the instant case, the parties entered into a form "Articles of Agreement" which recited the purpose of the grant and the county's responsibilities with regard to its entitlement to state funding.

[11] As originally introduced, SB 1517 did not contain a grant-in-aid program and only defined the parameters of road patrol service by local and county law enforcement. However, § 77(3) is virtually indistinguishable from the amendment originally introduced pursuant to the House Substitute to SB 1517:

the language of § 77(3) fails to exclude partial contractual support from county effort, there is no statutory bar to the inclusion of township contracts. However, "[w]hile it is axiomatic that this Court must enforce clear and unambiguous statutory provisions as written, it is equally true that '[w]hat is "plain and unambiguous" often depends on one's frame of reference.' The whole act provides this proper 'frame of reference' in cases of statutory construction: 'A statutory provision that is in dispute must be read in light of the general purpose of the act and in conjunction with the pertinent provisions thereof.' " *Metropolitan Council No 23, AFSCME v Oakland Co Prosecutor,* 409 Mich 299, 318; 294 NW2d 578 (1980) (citations omitted). Accordingly, I find that analysis of Act 416 as a whole instructive in our construction of § 77(3).

In *Brownstown Twp v Wayne Co,* 68 Mich App 244; 242 NW2d 538 (1976), lv den 399 Mich 831 (1977), the Court of Appeals held that local county sheriffs' departments were not subject to a common-law duty to provide law-enforcement services along all county roads. The appellants, charter and organized townships, received the majority of their road patrol services from the Wayne County Sheriff's Department. The county, confronted by mounting deficits, drastically reduced its road patrol services to these areas and further informed the townships that they would be required to contribute to the cost of any continued service. The townships objected to the reduction in man-

An agreement entered into by a county shall be void if the county which contracted to provide the specified services reduces the percentage of local expenditures made for law enforcement services, the level of those services, or expends the allocation in a fashion inconsistent with the approved contract. [1978 Journal of the House 2114.]

power, asserting that it would provide inadequate law enforcement and that the county bore the primary financial responsibility for road patrol service and could not require the townships to subsidize county law-enforcement efforts.

The Court of Appeals disagreed, finding no common-law or statutory duty to provide road patrol services beyond reasonable efforts. 68 Mich App 251. Although the sheriff was subject to a greater duty of care in areas of inadequate local law enforcement, that duty extended only to the exercise of reasonable diligence in keeping abreast of known illegal activity and timely response to requests for assistance from local law-enforcement authorities. *Id.*

The *Brownstown Twp* decision reflected long-standing tensions between local and county law-enforcement agencies concerning their ill-defined roles with respect to road patrol services along local and primary county roads. The problem was exacerbated by the fact that both counties and townships alike were constrained by limited revenues which resulted in inadequate or nonexistent road patrol service for outlying areas. However, the decision further presented the Legislature with the task of striking a delicate balance between addressing the needs of a public bearing the burden of inadequate road patrol services, while curtailing the role of the state so as to avoid its undue encroachment into an arena constitutionally designated as the responsibility of county and local government.[12]

---

[12] Const 1963, art 7, § 4 delegates the duty of law enforcement to the county by the provision for the office of sheriff. The concern over maintaining the balance of power between local and state government prompted the Governor's veto of SB 1517 as an ill-advised infringement upon the sovereignty of local government and its decisions with regard to the allocation of funding regarding law enforcement. See 1978 Journal of the House 2561. The provision was subsequently reintroduced as SB 1682 and adopted as Act 416.

I find it clear that the Legislature intended to encourage road patrol service in these areas through coöperative efforts of local and county governments by means of Act 416 funding. However, I also note that it took great pains to ensure that the local entities involved should bear the primary financial responsibility for law-enforcement services, and not indirectly shift that responsibility to the state, by the inclusion of two complementary maintenance-of-effort provisions in Act 416.[13]

Section 76(3) of the act explicitly acknowledges the right of local cities and villages to enter into contractual arrangements with their respective county sheriff's departments for additional road patrol services.[14] However, it further conditions the validity of these agreements upon a maintenance-

---

[13] See Cappalli, n 2 *supra* at § 4.09, p 34:

> [Maintenance of effort] serves the salutary purpose of preventing grantees from substituting federal funds for the revenues which they had applied to the same activity ("x") in past years. The substitution danger occurs when the federal government offers grants for activity "x" which is already financed to a significant degree by state and local governments. In such case the United States hopes to achieve greater levels of benefits and services through federal financial support. Without a [maintenance-of-effort] clause or its equivalent, the grantee could simply reduce its support of the activity "x" to the extent of the newly available federal funding. In this way it would release these local funds for other purposes, whether tax relief or different programs. This in effect converts the federal program to support "x" into a program to support whatever the grantee desires, or revenue-sharing.

[14] MCL 51.76(3); MSA 5.868(16)(3) provides in relevant part:

> Upon request, by resolution, of the legislative body of a city or village, the sheriff's department of the county in which the city or village is located shall provide the services described in subsection (2)(a), (c), and (d) on those portions of county primary roads and county local roads and state trunk line highways within the boundaries of the city or village, which are designated by the city or village in the resolution.

of-effort provision, comparable to § 77(3), which renders any such contractual arrangement void should the participating local municipality reduce its level of law enforcement below the highest number in existence within thirty-six months of entering into the contractual arrangement with the county for Act 416 services:

> A resolution adopted by a city or village to request services under this subsection shall be void if the city or village reduces the number of sworn law enforcement officers employed by the city or village below the highest number of sworn law enforcement officers employed by the city or village at any time within the 36 months immediately preceding the adoption of the resolution.[15]

As local cities and villages are held to a minimum standard of financial responsibility with regard to Act 416 law-enforcement services, § 77(3) similarly requires that county government maintain a minimum threshold of financial commitment prior to its entitlement to Act 416 funding.

In §§ 76(3) and 77(3), the Legislature chose to address the prerequisites to Act 416 funding by the imposition of differing base levels of law enforcement for local and county government. In addition, their respective entitlements to state funding are addressed in separate portions of the act and are phrased solely in terms of either county or local government without mention of financial support from other governmental entities or programs. Accordingly, upon examination of §§ 76(3) and 77(3), I conclude that the latter's silence on the inclusion of outside sources of funding is consistent with the Legislature's intention to examine local and county government independently for purposes of grant funding.

---

15 See MCL 51.76(3); MSA 5.868(16)(3).

However, § 76(3) speaks *only* in terms of base level of personnel which cities and villages must maintain and is silent with regard to whether Act 416 *township* participation is to be so similarly held. The majority finds the exclusion of township personnel is indicative of the Legislature's intention to allow the county to include township as opposed to city or village personnel for purposes of Act 416 funding. I disagree. There is no mention of townships in either § 76(3) *or* § 77(3). Further, to equate autonomous townships with county government, in the absence of clear statutory language in support, appears to ignore the reality that counties and townships are not alter egos, but rather are separate legal entities. If the Legislature had intended to find townships and counties synonymous it could have easily done so. Thus, while the townships are apparently not subject to § 76(3), because § 77(3) speaks only as to *counties,* I decline to hold that the instant contracts should be included within consideration of appellants' base level of road patrol.

Further, I reject appellants' assertion that the exclusion of contractual personnel from the determination of a county's eligibility for Act 416 funding is inconsistent with the act's remedial intent of increasing the overall number of road patrol officers.

Act 416 provides an *opportunity,* not a *guarantee,* for local and county government to receive additional funds as a means of expanding services whose distribution rests with local and not state government.[16] As is the case in any other grant-in-aid program, the opportunity to receive remedial benefits is premised upon the grant recipient's

---

[16] See MCL 51.77(4); MSA 5.868(17)(4), which states that a county's responsibility for Act 416 services does not extend beyond monies granted pursuant to § 77(3).

satisfaction of the conditions precedent to funding eligibility. In the instant case, the county's failure in 1983 to maintain its general fund personnel at the 1978 base levels as required by § 77(3) denies appellants the opportunity to receive Act 416 assistance.

I do not accept appellants' contention that the exclusion of contractual personnel from the county's base levels in effect penalizes a grant participant's coöperation with other local government entities. The county remains free to engage in as many contractual arrangements as are fiscally possible. However, the Legislature's encouragement of coöperative effort between local and county law enforcement does not obviate the county's continued responsibility to meet a base level of financial commitment.

Moreover, it is in the grantee's interest not to be placed in a position of potential dependency upon outside sources of funding for entitlement to Act 416 funding. The inclusion of such funding can easily serve to stand as a two-edged sword with regard to the county's interests. Admittedly, the inclusion of contractual officers partially funded by townships would acknowledge a level of fiscal effort by the county. However, a construction of § 77(3) cannot ignore the reality of the varying economic health of local townships or the nonpermanence of federal funding which could equally serve to deprive a grant recipient's funding eligibility through no action of its own. Further, the inclusion of contractual personnel runs counter to the Legislature's intention to examine local and county government pursuant to §§ 76(3) and 77(3) independently for purposes of grant eligibility and its failure to equate townships with county government. If appellants assert that the base level present with the maintenance-of-effort clause no

longer bears a reasonable relation to present-day grant participation, that is a matter for the Legislature to consider.

Appellants argue, in the alternative, that even if contract deputies partially funded by townships may not be included for purposes of determining the county's eligibility for Act 416 funding, the county stands in substantial compliance with this provision. Appellants assert that for fiscal year 1983, the county dollars expended on the sixty-four partially funded contract deputies was equivalent to the full salaries of approximately eighteen general fund deputies.[17] Thus, appellants find that if the dollars expended on their fully funded personnel are added to their outlay for the jointly funded officers, the county was essentially funding forty-three officers, i.e., two officers less than its 1978 level.

I find no provision within Act 416 allowing for substantial compliance with § 77(3)'s maintenance-of-effort provision. Appellants' position obscures the fact that the maintenance-of-effort provision is a substantive prerequisite to the receipt of state funding. This construction would undercut its ability to ensure that grant recipients maintain a constant minimum level of financial support and not enjoy enhanced services on the basis of state funding without bearing its respective financial burden. Had the Legislature intended to entertain the possibility of accepting a greater financial role in the delivery of Act 416 services, it could have easily done so.[18]

[17] In actual dollars the county's expenditures on its contractual deputies was the equivalent of 17.38 fully funded officers.

[18] Cf. MCL 18.423(a); MSA 3.519(103)(a), the maintenance-of-effort provision controlling the distribution of Michigan justice training act funding, which states in relevant part:

However, despite the absence of a substantial compliance exception, § 77(3) includes an economic-hardship provision which permits the receipt of grant funding in instances of noncompliance with the maintenance-of-effort clause, upon a showing by the grantee that the reduction either in personnel or in expenditures below its 1978 base levels was predicated by economic hardship necessitating budgetary reductions in all county services.[19] In the instant case, the OCJ determined that appellants' fiscal-year budget did not exhibit economic constraints sufficient to waive the maintenance-of-effort clause. In light of appellants' failure to contest the OCJ's findings either before this Court or the Court of Appeals, I do not find it necessary to address the applicability of this exception.

B

Appellants also argue that the OCJ's position conflicts with the contractual Articles of Agreement entered into between the county and OCJ, specifically paragraph 21 which provides:

> *Insofar as is possible,* a distribution made under this subdivision shall serve as a supplement to and not as a replacement for, the funds budgeted on October 12, 1982, by a city, village, township, county, junior college, community college, state supported college or university, or the department of state police for the in-service criminal justice training of its police officers. [Emphasis added.]

[19] The OCJ did not issue formal guidelines articulating the factors used in determining whether a grant recipient satisfied the economic-hardship exception to the maintenance-of-effort provision. However within the answer to plaintiff's interrogatories, OCJ Director Patricia Cuza stated that the agency examined, among other factors, personnel reductions in other delivery services, road patrol personnel salaries in comparison to other county employees, and other budget reductions. Prior to 1982, § 77(3) provided that determinations of economic hardship for purposes of Act 416 funding were to be made pursuant to resolution by the Senate and House appropriations committees. In 1982 PA 313, the Legislature repealed this portion of the statute.

The sheriff shall immediately *inform ocj of any reductions* in the working number of county funded road patrol positions *if the remaining number of working road patrol positions is below the September 30, 1978 level.* Such notification shall include the latest county estimate of total county general fund revenue for the pertinent county fiscal year. Notification in accordance with this section shall be in writing and shall include appropriate explanatory information. [Emphasis in original.]

Pursuant to paragraph 21, appellants assert that they were required to notify the ocj of any reductions in the working number of county-funded positions *only* if the remaining number of all working road positions fell below the 1978 levels. Thus they find implicit from this provision that a reduction not only in general fund deputies, but also in contract-deputy positions, could also result in a county's ineligibility for Act 416 funding. Appellants conclude that any ambiguity present within the agreement should be construed against its drafter, the ocj. I disagree.

Grant-in-aid programs are distinguishable from traditional bilateral contracts.[20] Specifically, the terms qualifying the receipt of the grant-in-aid program are not subject to negotiation, are subject to unilateral modification by the state or federal government, and may not be waived by the agency entrusted with the implementation of the program itself. Further, all rights of redress, save that of the recipient's opting not to seek grant funding, are determined unilaterally either by the federal or the state government. Although there is no question that all grant-in-aid programs have contractual aspects, they are nonetheless statutory

[20] See, generally, Cappalli, Rights and Remedies under Federal Grants, pp 53-57.

creations, and it is this aspect which is appropriately denoted paramount consideration.[21]

Upon examination of paragraph 21, while it requires a recipient to report all reductions in personnel, this does not imply that the grantee is relieved from its responsibility to maintain a base level of personnel funded solely by the county pursuant to § 77(3). Accordingly, I find that any ambiguity within this provision necessarily must be resolved pursuant to the construction of the controlling statute upon which the agreement itself is premised.

C

Finally, appellants assert that the OCJ's position is contrary to its own administrative guidelines.[22] Appellants find that paragraph 4 of the guidelines

[21] Accord *Bennett v Kentucky Dep't of Ed,* 470 US 656, 669; 105 S Ct 1544; 84 L Ed 2d 572 (1985).

[A grant] cannot be viewed in the same manner as a bilateral contract governing a discrete transaction. . . . Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy. . . . [T]he fact that [the grant-in-aid] was an ongoing, coöperative program meant that grant recipients had an opportunity to seek clarification of the program requirements. Accordingly, we do not believe that ambiguities in the requirements should invariably be resolved against the Federal Government as the drafter of the grant agreement.

[22] In a memorandum dated January 5, 1979, then OCJ administrator William Nugent issued guidelines to Act 416 recipients regarding the role of contractual arrangements with local townships and other sources of outside funding and their effect upon a county's eligibility for state funding:

To be eligible for PA 416 funding, according to the Act, a county must not reduce its expenditures or level of road patrol below that which the county was expending or providing immediately before the effective date of the Act.

Counties receive funds from many sources, including local taxes, state and federal general revenue-sharing, . . . contrac-

clearly provides that it is the reduction or elimina-
tion of contract deputies *due to actions by the
county* which would render the county ineligible
for Act 416 funding. Thus, appellants argue that if
such a reduction may infringe upon their eligibil-
ity for state funds then the contract personnel
must necessarily be included within a determina-
tion of § 77(3) compliance.

I find that while this provision arguably conflicts
with the OCJ's most recent stance on Act 416
compliance, because the statutory provision is con-

tual arrangements with other governmental units, . . . and
others. For the purposes of these guidelines, these funds will be
categorized as follows:

the general fund of the county (i.e., those locally raised reve-
nues whose allocation is at the sole discretion of the county
board of commissioners),

funds which effectively support a county's budget (i.e., federal
and state general revenue-sharing . . . ), and

specific grant funds ( . . . contractual arrangements with other
governmental units).

                            *    *    *
Following, for your information, are general guidelines rela-
tive to maintenance of effort:
  1. Inasmuch as it is legislative intent that PA 416 funds not
supplant county budget funding, the county budget for road
patrol and the number of road patrol officers authorized in the
county budget prior to 1 October 1978 must be maintained.
Any action that would reduce the number of road patrol
officers or expenditures funded from the county general fund
will render a county ineligible for PA 416 funds. (However, see
PA 416, Section 1 [Section 77(1)], last sentence.)

                            *    *    *
  3. The reduction or elimination, due to restrictions or re-
quirements of the providing agency, of sheriff's road patrol
positions supported by specific grant funds will not affect eligi-
bility for PA 416 funding.
  4. *The reduction or elimination, due to actions by the county,
of sheriff's road patrol positions supported by specific grant
funds renders a county ineligible for PA 416 funding.* [Empha-
sis added.]

trolling as to *all* aspects of eligibility, to the extent that the administrative guideline is inconsistent with this Court's construction of § 77(3), it is invalid.

### CONCLUSION

I would hold that compliance with MCL 51.77(3); MSA 5.868(17)(3) is determined by the number of secondary road patrol officers funded solely by the county-grant recipient. The decision of the Court of Appeals should be affirmed.